Next case this morning is United States v. Haldorson. Good morning, Mr. LaPuma. Good morning, Your Honor. May it please the Court, my name is Frank LaPuma and I represent defendant-appellant Michael Haldorson. I'd like to start with the first issue, which is our contention that probable cause cannot exist in perpetuity, especially when it is cloaked in lawless conduct by police officers. And what we have here… But it's three weeks, really, in perpetuity. I agree, Judge. And there's case law out there. Judge Cannelli cited Foreman, which was more of a civil rights case, and that was like approaching a year. But then you have the Reiss case, R-E-I-S-S case from the circuit. It was merely a day, and the Court considered that and said, well, you know what? The officer consulted with the prosecutor, so that's excusable. In this instance, it's not excusable, Judge, because they did nothing to advance this. This isn't the type of DEA-FBI case that we're used to in this building. This was a one-off case. This was a case where they arrested the informant. They gave the informant his freedom. If he gave up three other people, the third person he gave up was Michael Halderson. And so once they had Halderson, they made him the same offer. Give us three people, we'll make this case go away. It's this rotation that you see in state court, Judge. It's quite different than it is here. So what happens here? Why didn't they arrest him on June 1st when they could have? When they thought he was an armed drug dealer at a Walmart? According to the informant, he had a gun. Why didn't they go in for it? Because the officer said, I got stopped at a red light and I turned around. There's a lot of strange things that occurred in this case. I can spend my 15 minutes here going through a laundry list of the inconsistencies and contradictions in the evidence and also the misconduct. But why, Mr. LaPuma, does that impact the probable cause to arrest? He got stopped at a red light. Maybe they should have had better surveillance set up. Maybe he should have gone through the red light. But those are separate issues. Why does that impact whether or not they had probable cause to arrest your client three weeks later? Let's not forget that the main witness in this case is Thomas Inslee, who is a member of this squad, this team, this task force. And he's the only one who testified that he patted down the informant before the deal, that he didn't have any drugs on him. He's the only one who patted him down after the fact and said he had drugs on him. And that's what Judge Kennelly relied on was the judge said he would only consider corroborating. Judge Kennelly recognized that there were problems with this case. And he said, I will only consider this when it's corroborated. But it wasn't corroborated in this instance, Judge. And what we have here is three weeks of no activity. And then Sergeant Ladd decides, today we're going to arrest Mike Halverson. But Judge Kennelly's corroboration was more than just the officer. And he found the officer credible, which, you know, it's hard to get that overturned. But he also relied on the transcripts of the audio tapes of the buy with the CI. So there were tapes where your client and the CI were engaging in a drug buy that Judge Kennelly read. I don't know if he listened to the audios as well, but the transcripts were admitted into the record. That's the big corroboration he was relying on for the arrest. Okay. Judge, and he did listen to the tapes. The tapes were played, so Judge Kennelly did have that, was operating beyond more than the transcript. It's our position, Judge, that they had three weeks to do something. Under Terry, even though this isn't a reasonable suspicion case, under Terry, when practical, the police need to go and get a warrant. And the reason why it's important in this instance, the reason why police misconduct is important here and why it needs to be deterred is because it gave these officers the discretion to arrest Michael Halverson whenever they wanted to. For instance, he's with some other people who they've wanted to target for some time. Let's arrest him now so we can really work on these other people as well. Michael Halverson enters a premises, someone's home. Let's arrest him now so we can do a search of the home. It gives these particular officers. But what says they can't do that? What law out there says that law enforcement can't determine when they have probable cause, when they want to arrest someone? They absolutely can. We know that there's case law that says that they can. How long does that last? I don't know how long does that last. Does it last a lifetime? It shouldn't. Again, three weeks is not a lifetime, or three weeks and change. In this particular case, Judge, I think what we have to deal with is the taint of the entire investigation. Let's not forget that they concealed and hid the informant's arrest in December of 2014. They concealed and hid his arrest in May of 2015, 10 days before the June 1st deal. Well, I think Judge Canelli decided they were not concealing and hiding that, and it was turned over in advance of trial, and the jury certainly had the ability to consider your argument on that. Well, I'm not arguing insufficiency of the evidence, Judge. I'm arguing the motion to suppress, we did not have that information. But Judge Canelli, in the post-trial motions, ruled that even if he had known that at the time of the suppression hearing, he would still have found probable cause. And this is where we respectfully disagree with Judge Canelli's factual finding, and that is that this was a series of irregularities, as he referred to it, and that the line between misconduct and errors or sloppiness is not always bright and clean. That's what we're going to, Judge. That's what we're arguing with respect to the June 23rd stop. If I can move on to the locked bedroom, if I may. I want to make this point as well. There were no exigent circumstances to go into Mr. Halderson's locked bedroom. This case is very close to United States v. Yengel out of the Fourth Circuit, where they were confronted with what was considered to be a bomb in a locked closet. They pried open the door. It didn't contain a grenade. It was a great grenade. It did not contain a grenade, but it contained some other kind of military canister or something. And the Fourth Circuit suppressed it because that device was stable and inert. No one could get access to it. The identical thing occurred here, okay? The identical thing that nobody had access. Halderson was in custody. The roommate remained in the apartment during the consensual search and the warrantless search of his bedroom. Who opened the door? One of the police officers. Earlier in that evening, Judge, they arrested Mike Halderson. They took keys off of his person. They went to the playing field. They did not know what building he lived in, so they went up and down the street, putting keys into the locks to see which they could get, what door it opened. It did open one of the doors, which was locked, which Judge Ganelli found it was locked, which all the officers said it wasn't locked or they didn't know whether it was locked. They gained access that way. They got into the apartment, and then they took another one of his keys, Judge, and used that key to open up his locked bedroom. And the woman who lived at the apartment consented to it and let them in. I know she didn't have consent over the locked room, but she consented to them entering the apartment. That's correct, which took away the taint of the initial illegal entry, and Judge Ganelli's view, and we didn't argue much beyond that as well. Mr. LaPuma, I couldn't tell from the record how much time passed between the time that your client admitted to them in his post-arrest statements that he had explosives and the time that they entered the bedroom. Okay, so first of all, my client disputes that he told them that, Judge. There is evidence in the record to support that. Yes, they testified to that. Correct. So it must have occurred sometime between 10 and midnight of that night. What was that, the statement? The statement, because that's when he was being interrogated. The police officers after that went to Paulderson's parents' home, did a search, consensual search there, and the father clued them into him living in Plainfield on Lockport Street, and that's when they went up and down the street looking for those things, and that's when they entered his bedroom. And how much time? So they got to the apartment about 4 a.m. To the parents' apartment or to Mr. Paulderson's apartment? Mr. Paulderson's apartment about 4 a.m., and then at 6.50 a.m. a state court judge signed the warrant. So you can imagine they probably were in front of a judge by 6.30 that morning because he had signed it by 6.50. And they, I'm sorry to interrupt, but they entered his apartment at 4 a.m., and when did they search the locked bedroom before obtaining the search warrant? So it would have been sometime after 4 a.m., Judge. There's no pinpointed time? I didn't see one. I want to make sure. Actually, there's a discrepancy in the officer's testimony as to when the timing occurred, but according to the government's brief and something that we're fine with, because I know 4 o'clock is one of the strong points in the case, is it looked like they were there at 4 a.m., they did a search of the common area of the apartment, then they took a key and opened his locked bedroom. Okay. With respect to our second issue, constructive amendment of the indictment, and this, we think, is very clear in this instance that Mr. Paulderson did not get a fair trial. There was an error in the instructions to the extent that the indictment said that he unlawfully carried an explosive, namely smokeless powder. So what does that do? Just like the court's case in Lykman, when you use to wit, when you use namely, when you use specifically, in this instance they identified smokeless powder as the component of the illegality. Is your argument, Mr. Lipuma, that they had to prove that the defendant knew it was smokeless powder, or is your argument that the jury could have convicted without finding what he had was smokeless powder? The latter, Your Honor. Yeah, so the government argued basically that they don't have to prove it's smokeless powder. We took exception to that. We said they do have to prove smokeless powder because it became an object of the offense. It became an element of the offense. And the court said, well, look, the government are analogized to drug cases where it's like, well, it could be any controlled substance. In this instance, we think the difference is it's not a drug case. This is a weapons case. This is a gun or weapons case, which distinguishes it from the drug cases where the court has said it can be any type of controlled substance as long as he knew it was a type of controlled substance. Here, because the court said in Lightman, the 1990 case that we cited, that it was, to wit, a Mossberg rifle, and that was introduced into evidence along with two other guns, and the jury was instructed about a firearm only. But here, and here's the difference with that case. In being instructed on the elements on count four, the jury was specifically told, that they had to find just the second element, the defendant knowingly carried an explosive, namely smokeless powder, during the commission of that crime. How could a jury have found that element without finding that the explosive itself was smokeless powder? Outstanding question, and this is to the crunch of our argument. The jury was also instructed on the use of the term explosive in that same instruction, Judge, that you just identified. He possessed an explosive, namely smokeless powder. Then the court defined explosive for the jury as gun powder, powders used for blasting, and smokeless powders. Okay, so it broadened the basis of what could be used as the grounds of conviction, and then, in closing rebuttal, the prosecutor went up there and told the jury that Michael Henderson knew there was an explosive powder inside, not a smokeless powder, an explosive powder inside. But doesn't that go to the knowledge element, which is the question I just asked you a moment ago? They had to find that the government had proven that the defendant knew there was an explosive, not that the defendant knew there was smokeless powder, just that what it turned out to be was smokeless powder. It seems like that goes directly to that element. I agree with that, Judge, except for the Lightman case, the Willoughby case, the Castillo case, and the O'Brien case, which is all our side in our lead brief. And that's because the government, when they drafted the indictment for the grand jury, they put in there, namely, smokeless powder. And based on Lightman and the other authorities from the Supreme Court, once you take and identify the specific object of the illegality, that becomes an element to the offense. But the Lightman and Willoughby cases did not include in the jury instructions the fact that that specific firearm had to be the firearm that he actually had, which distinguishes it here. They didn't have that, namely, smokeless powder as part of their instructions. So my understanding of the Willoughby case really was more about the nature of the underlying offense. It was charged as a distribution of drugs, but the government proved a possession of drugs. And so this court said that that was improper. So the better case, in our view, is the Lightman case because that goes to the identification of a particular weapon, a Mossberg rifle, and yet the jury was instructed about firearms generally and other guns were admitted into evidence in that case, and so the jury could have convicted along any of those. Same here. The jury could have convicted him for possession of smokeless powder, gunpowder, black powder. All of that evidence was brought in through the form of a chemist's testimony as well as through evidence that was seized during the case. Thank you. Thank you. Thank you. Good morning. May it please the court. The district court properly found that there was probable cause to arrest Helderson, the defendant, on June 23rd for his distribution of cocaine on June 1st. Now, the district court's ruling on that noted a number of shortcomings or mistakes made by the investigating officers, and so the district court properly looked to evidence that corroborated their testimony and specifically credited their testimony when it was corroborated. For example, there was the recording of the transaction that took place in the Walmart parking lot that night, which is clearly a drug deal happening. Officer Inslee testified about the phone calls that set up that transaction between the informant and Mr. Helderson that were made in a controlled environment. Those calls were not recorded, but Inslee testified about the phone records that corroborated the fact that a phone call was made at that time. Were those phone records admitted into evidence? I believe they were in the suppression hearing. In the suppression hearing. Right. Those phone records corroborated the controlled phone call that set up the transaction, that the automobile that showed up in the Walmart parking lot was the one registered to Michael Helderson that had been identified by the informant that day, and the informant was searched before and after, provided by money by the officer, and after the transaction was complete and the officers met with the informant, he surrendered to them a substance that field-tested positive for cocaine. We submit, and the district court found, that that was probable cause to believe that Michael Helderson had distributed cocaine on that day. Three weeks later, then, another transaction is set up. There's a plan in place, and the district court found that the plan was to arrest Helderson that day after having arranged for another cocaine transaction with the informant. The plan was not to have the informant meet Helderson that day, but instead to set it up and then arrest Helderson on his way to the deal. And that's what happened. Helderson was arrested that day in the car, the same car that had showed up at the Walmart parking lot on June 1st, and his arrest was made on probable cause. It was entirely proper. Given that the arrest was proper, then the search of the car was proper. Not as incident to an arrest, but because the car was going to be towed by the police officers. Is this when they found the pipe bombs? That's when they found two pipe bombs in the trunk and one in the rear passenger compartment of the automobile. That's right. One by the officers there, and the evidence recovered was not suppressed because it would have been inevitably discovered as a result of an inventory search. They couldn't open it as an incident of arrest? Well, the district court didn't rule on that ground because Helderson had been, I guess, handcuffed, taken out of the car at the time the search took place. But the district court did find it would have been inevitably discovered. And then Mr. Helderson, now we go to the search of his apartment. There's a consent search to the common area of the apartment and an exigent circumstances search of his locked bedroom. Did the officers do anything more than just a plain view search of the locked bedroom? On their initial entry? Correct, before they got the search warrant. I don't believe they did. Is there any evidence that they looked under the bed, in the closets, in the drawers? No. No, I think the evidence was that they open up the bedroom door using a key. They go in, and they see a large quantity of illegal fireworks. And at that point, they decide to secure the fireworks, clear out the apartment, and leave and get a search warrant. How is just a plain view search of the locked bedroom consistent with exigent circumstances? And if they really thought there are explosives, we're concerned, we don't want this apartment blowing up, we don't want the street blowing up, and they go in, but they just look at what's in plain view, how is that consistent with exigent circumstances? Well, I think in a couple of ways. One, Your Honor, their plain view of the bedroom showing a large quantity of fireworks might have made them reasonably decide, you know what, let's get out of here, let's clear it out, let's secure the scene, clear the apartment. Was there any testimony to that effect? There was. Well, there was evidence that after seeing the initial quantity of fireworks in plain view, they did secure them and clear out the apartment. So they might well... And was there any, I don't recall if there was any testimony where they said they stopped at that point because they were concerned about the safety of the people. I don't recall that testimony either. But one could reasonably understand them to have acted in that way. When you look at fireworks, I don't know anything about them, frankly. We talk about pipe bombs. Now, what are discernible when you see a pile of, what, fireworks? I don't know. Are there some that are legal, I guess? They were not legal. Well, I mean, they identify as not being legal, so I don't know what that looks like. They used to have things when I was a kid called cherry bombs and some other stuff. But apparently illegal ones are something more than that. There are, I don't know, I don't know what a legal firecracker looks like or an illegal one. I think this is more than firecrackers, John, but I don't exactly know what was in the... Well, they saw them right away, apparently. They did. It was a quantity, I believe, just on the floor in his bedroom. You know, the district court, you know, did have that same question your Honor had about their behavior as being whether it was consistent with exigent circumstances or not, namely the limited scope of the search they made on the initial entry into the bedroom. But the district court found that, on the other hand, it was consistent with exigent circumstances, their belief in that, that the officers cleared out the apartment, secured the fireworks, and made sure nobody got hurt. I should point out that one of the contributing factors to the belief that there was reasonable belief in exigent circumstances was that Halderson, in his post-arrest interview, was asked whether he had more explosives at his residence. And he said there might be. And then when they tried to figure out where he lived, Halderson was not forthcoming, I should say. I think he pointed to his parents' home. As it turned out, he actually didn't live there. And then finding exactly where he did live and shared an apartment with the young woman took some time for the officers to do. So the fact that they had recovered three pipe bombs in his car, some fireworks, some drugs, and that he may have had more at home but was being coy about where he lived, that kind of alerted him, alerted the officers to whether or not, you know, that there might be some, there might be more pipe bombs behind the building. So that's, I was waiting for you to say that. I assume that's, that would be why they went looking around. Right. Now, and there was no evidence that these pipe bombs were of inert, safe items that wouldn't cause anybody any risk because, unlike a sort of military grenade, these were homemade items that had a simple fuse and were made with smokeless powder. You're talking about the pipe bombs? The pipe bombs from his car, that's right. They were dangerous and risky. So the officers acted reasonably. They could have done more on their initial entry, but they didn't. Instead, they backed off and got a search warrant and then went back in and found some cocaine, some MDMA, a couple of computers, and so on. Was it the same officers who went back in, or did they bring in bomb specialists? I know that the bomb specialists had been brought in once the pipe bombs were discovered in the car. They brought them to the scene. Right, I believe so. Were they at the apartment? I believe so, because they secured the fireworks in a, I believe, a Cook County bomb squad or a secure box. Somebody whose specialty in knowing what dangerous stuff is, are they one of the people that entered the bedroom? I believe so, Your Honor. I believe so. I wasn't sure that's what the record suggested. I may be wrong, but I thought because they had secured the fireworks in a bomb-proof container that they had brought in the specialists by then. So they recovered the items from the bedroom under the search warrant, and then they get a further search warrant to go to a storage unit where two cans of smokeless powder are recovered, as well as a firearm. Is that smokeless powder already labeled? It's a dangerous, it's an illegal substance? I don't believe smokeless powder is illegal. What's it do that makes it handy for these guys? Well, there was expert testimony at trial about what smokeless powder consists of. I believe it's used in firearm ammunition, for example. So if you were reloading a firearm, you would use smokeless powder to load the cartridge. Well, nobody does that. Are you talking about muzzle loaders or something? No. You buy a bullet, it's a bullet. Yeah, rifle cartridges or handgun bullets, that sort of thing. Yeah, but they don't make their own. Well, smokeless powder is a commercially available item, but when placed in a destructive device or a pipe bomb, it becomes an illegal explosive or illegal destructive device, and that's what happened here. Mr. Henderson had the smokeless powder in his storage unit and the firearm as well. So really, this motion to suppress all goes back to this, whether or not there was probable cause to arrest him on June 23rd for the events that took place on June 1st, and we think the district court properly found that there was. As to the constructive amendment issue, I think the jury was properly instructed. There was no constructive amendment. The grounds for conviction were limited, as the court pointed out earlier, to a finding that there was smokeless powder involved in Count 4. It was a required element of conviction for that count. Were the pipe bombs using smokeless powder? Yes, there was smokeless powder in the pipe bombs. Well, that's significant, I guess. Yes, and that was the basis for conviction on Count 4. He carried an explosive, namely smokeless powder, during the commission of Count 2, possession with intent to distribute cocaine on that day. Did the government argue at any point that the explosive could be something else? No, no, and I think that's another reason for affirming on this argument because the government never argued that the smokeless powder in the storage unit, for example, could constitute a basis for conviction on Count 4. Well, what would any even anticipated use of that be? I don't know what a pipe bomb was. You can't be used for, or maybe it is something that people set off and enjoy watching or something. I don't know. Well, what would be the use of having smokeless powder? Well, that's what you need for a pipe bomb. Pipe bombs, to me at least, are the serious problem here. Right. When you get into the bedroom and say there's illegal fireworks, I don't know what that is. It's not enough to get a warrant. There was evidence that when initially interviewed, Halderson had stated that he made the pipe bombs recovered in his car. In the storage locker, there was evidence that in the storage locker, one of the components of the pipe bombs, smokeless powder, was recovered. But there's also evidence that in the storage locker were other components of pipe bombs, namely the PVC piping and end caps, as well as some of the fuse, what was called hobby fuse, that was found in the pipe bombs was also recovered from his storage locker. So the evidence suggested that, in fact, Halderson had manufactured the pipe bombs that were in his car. Okay. Well, the pipe bombs obviously do not have a common or practical use, as best I understand from this. Correct. So they're the ones when you have the caps and the various incendiary other things. It's dangerous, depending on who's doing something with it. But it could blow up. It could hurt people. Very, very. Yes. All right. We ask that the Court affirm Mr. Halderson's conviction. Thank you, Mr. Fullerton. Mr. LaPuma, anything else? Yes, I'd like to talk about the fact that Your Honor just nailed what Judge Cannelli said. He was troubled by the fact that this was purportedly a plain view search of Mr. Halderson's bedroom. If they were truly concerned that there were pipe bombs in there or things they could blow up, they should have searched the entire apartment, they should have searched the entire bedroom, which they didn't do. That shows that they did not have a reasonable belief or a compelling need to do a search without a warrant. Mr. LaPuma, at the time that they searched the bedroom, was the bomb squad there or were any specialists there, or was it the officers who were involved in the original approach? So there was one or two ATF agents who came to the scene after the arrest, and there was one gentleman from the Cook County bomb squad who came after the arrest as well. They were involved in the search of the bedroom. After that, after the plain view search and the fireworks were observed, there was no further law enforcement personnel brought in. There were no warnings to neighbors. There were no calls for backup to, for instance, the Plainfield Fire Department. Same law enforcement officers. Well, that's when they identified these fireworks as being illegal, when you had a couple of these so-called experts along, and then they went and got the warrant. Yes, Judge, and unfortunately for them, they also put in the application for the warrant that they had found those fireworks, illegal fireworks, during the plain view search, which is improper to do, to tell an issuing judge for a search warrant that what they already found was illegal. So they put that in the search warrant, which they shouldn't have done. Okay, so they had more information than what they were anticipating they needed to search warrant. So they already had the evidence, I guess you're saying. They had the fireworks. There were no pipe bombs in the apartment. There were no pipe bomb components in the apartment. The thing that makes this thing especially important is the fact that the government urged conviction on black powder or gunpowder as stated in the prosecutor's closing rebuttal argument when the facts of the case show and the evidence that came in during the expert testimony was that double-based products and single-based products of smokeless powders contain nitrocellulose or nitroglycerin. That's the difference. That's what makes it much more important, and that's why when the government charged that, they charged that as an object of the offense and as an element of the offense. They did not prove that. Thank you, Mr. Lupuma. Thank you. We'll take the case under advisement.